*1022
 
 Opinion
 

 TURNER, P. J.
 

 I. Introduction
 

 Defendant, Keith E. Gatson, appeals from his convictions for: first degree murder (Pen. Code,
 
 [1]
 
 § 187, subd. (a)); second degree robbery (§211); attempted second degree robbery (§§664, 211); assault with a deadly weapon causing great bodily injury (§ 245, subd. (a)(1)); and bringing a weapon into a jail. (§ 4574, subd. (a).) It was determined that defendant was engaged in the commission of the crime of robbery when he committed the murder. (§ 189.) It was also found that defendant personally used a firearm in the commission of the murder and robbery (§ 12022.5, subd. (a)). Further, the jury found that a principal was armed with a firearm in each offense. (§ 12022, subd. (a)(1).) In the published portion of the opinion, we address the scope of the dying declaration exception to the hearsay rule. (Evid. Code, § 1242.)
 

 II. Factual Background
 

 When viewed in a light most favorable to the judgment
 
 (Jackson
 
 v.
 
 Virginia
 
 (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560];
 
 Taylor
 
 v.
 
 Stainer
 
 (9th Cir. 1994) 31 F.3d 907, 908-909;
 
 People
 
 v.
 
 Barnes
 
 (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]), the evidence indicated defendant and his codefendant, Clyde Keith Davis, chased Joy Michelle Magdaleno with a gun, took her necklace, struggled with her, and pinned her to the ground. Defendant then shot her in the head and shoulder and took her purse from her automobile before fleeing in Mr. Davis’s car. During the decedent’s subsequent hospitalization and prior to her death on December 19, 1992, she told her brother, mother, and father on various occasions that defendant and Mr. Davis had kicked, beat, robbed, and shot her. Some of the decedent’s statements were tape-recorded by her family. At the time some of the statements were made, the decedent told her family members that she was dying.
 

 in. Procedural and Factual Matters Relating to the Admissibility of the Dying Declaration
 

 Prior to trial, defense counsel filed a motion to suppress the decedent’s statements. The issue as to whether a robbery had occurred was of some consequence. The prosecution proceeded on a robbery felony-murder theory.
 
 *1023
 
 Defendant was ultimately convicted of first degree murder. As a result, defendant’s trial attorney quite intelligently thoroughly litigated the admissibility of the decedent’s hearsay declarations concerning the robbery.
 

 Two hearings before different judges were conducted regarding the admissibility of both the tape-recorded matters and other statements made by the decedent. After the first hearing, Judge Charles Horan initially ruled: “The court has considered the testimony and arguments relating to die statements made by the victim at various times during her hospital stay, and has listened to exhibit #1. The court’s ruling is as follows: ['ll] Several of the statements do qualify as dying declarations under Evidence Code section 1242, notwithstanding the fact that several days elapsed between the victim’s injuries and the statements. The test is not the duration of time between the injuries and the statements, but rather whether the statements were in fact made under an impending sense of death, and relate to the (eventual) cause of death. The statements made to the victim’s mother on the day the victim ‘coded’ appear to so qualify, although the testimony from the victim’s mother is not entirely internally consistent. Roughly, these statements were to the effect ‘Did they catch him yet? Call Deborah. Tell her what a pig he is, what he did to me. They chased me, they robbed me, they kicked me, they shot me. I hurt where they kicked me’, [sic] followed by a name sounding like Gatson or Gudson. Apparently during the same conversation, the victim sayd [sic] ‘It was Keith and Keith’s mother’s boyfriend’, [szc] (See testimony of Detective Maxwell). [*][] That the victim was under an impending sense of death during the making of these statements is demonstrated both directly and circumstantially— directly through the statements of the victim to that effect which were received under Section 1250, and circumstantially through the extensive evidence bearing upon her physical state, which was severe to say the least, and earlier statements of the victim made to her brother, also admissible under Section 1250. In other words, the court finds that throughout large portions of her hospital stay the victim was in fact under an impending sense of death due to the extremely severe nature of her injuries and the sensations they caused her. The court further specifically finds that the victims [sic] statements to her mother on the date she ‘coded’ demonstrate that at that time she was under an impending sense of death as well. [C[Q As to earlier statements which mirror those set forth above, the court does not find that those statements were made under an impending sense of death, though they may have been—the record is inconclusive at this point. However, the earlier statements are admissible insofar as they qualify, explain, or make clear the statements referred to in paragraph two above. Further, the
 
 [sic]
 
 may be admissible on the additional ground that they qualify as prior consistent or inconsistent statements, though the court makes no such ruling at this time, and will in all likelihood be unable to do so until the trial is underway.”
 

 The trial judge also held an additional hearing on this issue. Judge Harvey A. Schneider, who actually tried the case, ruled: that the statement made by
 
 *1024
 
 the decedent on the day she “coded”
 
 [2]
 
 was admissible; the statements made both on the tape and to her mother by the decedent would be admissible subject to a hearing to determine whether there was a sense of impending death; and, if the defense witnesses testified concerning the decedent’s mental state on December 15, 1992, the entire tape would be admissible to allow the jury to evaluate her apparent state on that date. Thereafter, the decedent’s brother, mother, and father testified regarding her recorded and unrecorded statements. Defendant’s witness, Dr. Ronald Markman, testified that based upon the nature of the decedent’s injuries, her reference to a “robbery” was more than likely a simple response to a question or a repetition of the term without full knowledge of the term’s meaning. During the prosecutor’s cross-examination of Dr. Markman, the trial court allowed the tape recording of the decedent’s statements to be played for the jury and specifically found its probative value outweighed any prejudicial effect. The tape was played to demonstrate the decedent’s ability to communicate, which had been challenged by Dr. Markman.
 

 IV. Discussion Concerning the Decedent’s Dying Declaration
 

 Defendant argues the trial court improperly allowed the admission into evidence of the decedent’s statement, “They robbed me.” He argues the decedent’s reference to the robbery did not come within the dying declaration exception to the hearsay rule because it did not relate to the cause and circumstances of the declarant’s death. We disagree.
 

 Evidence Code section 1242 provides: “Evidence of a statement made by a dying person respecting the cause and circumstances of his death is not made inadmissible by the hearsay rule if the statement was made upon his personal knowledge and under a sense of immediately impending death.” We examine a contention concerning the admissibility of hearsay utilizing the deferential abuse of discretion standard of review.
 
 (People
 
 v.
 
 Edwards
 
 (1991) 54 Cal.3d 787, 819-820 [1 Cal.Rptr.2d 696, 819 P.2d 436] [finding of trustworthiness for physical or mental states exception to the hearsay rule (Evid. Code, §§ 1250-1251) subject to abuse of discretion standard of review];
 
 People
 
 v.
 
 Tahl
 
 (1967) 65 Cal.2d 719, 725 [56 Cal.Rptr. 318, 423 P.2d 246] [abuse of discretion standard of review to be applied on appeal to the issue of whether a hearsay declaration was made under a sense of impending death as required by former Code Civ. Proc., § 1870, subd. 4,
 
 *1025
 
 repealed Stats. 1965, ch. 299, § 58, p. 1360 and reenacted as Evid. Code, § 1242.)
 

 The “cause and circumstances” of the death have been described as the res gestae of the death. (1 Witkin, Cal. Evidence (3d ed. 1986) The Hearsay Rule, § 728, p. 710; see
 
 People
 
 v.
 
 Taylor
 
 (1881) 59 Cal. 640, 648.) The California Supreme Court has held: “[T]he
 
 res gestae
 
 embrace, not only the actual facts of the assault and the circumstances surrounding it, but the matters immediately antecedent to and having a direct causal connection with the assault as well as acts, immediately following the assault and so closely connected with it as to form in reality a part of the occurrence.”
 
 (People
 
 v.
 
 Cipolla
 
 (1909) 155 Cal. 224, 227-228 [100 P. 252] [decedent’s dying declaration, including reference to his assault, the carrying of his body to the river and throwing it in, admissible res gestae];
 
 People
 
 v.
 
 Yokum
 
 (1897) 118 Cal. 437, 440 [50 P. 686] [decedent’s statement “to the effect that after the fatal shot defendant followed him up the hill, and the deceased begged him not to shoot him any more, that he was dying then” an admissible dying declaration];
 
 People
 
 v.
 
 Taylor, supra,
 
 59 Cal. at pp. 649-650 [decedent’s explanation of circumstances leading up to the his death admissible];
 
 People
 
 v.
 
 Nakamaru
 
 (1934) 136 Cal.App. 582, 587-588 [29 P.2d 320] [decedent’s statement that the defendant visited a cabin and poisoned some pancakes the previous evening an admissible dying declaration];
 
 People
 
 v.
 
 Gibson
 
 (1917) 33 Cal.App. 459, 460 [166 P. 585] [defendant’s statement that he had not lost a patient in 30 years made just prior to unsuccessful surgery admissible as a dying declaration];
 
 People
 
 v.
 
 Cyty
 
 (1909) 11 Cal.App. 702, 708 [106 P. 257] [“not only the actual facts of the assault and the circumstances surrounding it, but the matters immediately antecedent to and having a direct causal connection with the assault, as well as acts immediately following the assault and so closely connected with it to form a part of the occurrence” are subject to dying declaration exception to the hearsay rule]; 31 Cal.Jur.3d, Evidence, § 266, p. 344; Mendez, Cal. Evidence (1993) § 9.03, p. 168.) The fact all of the foregoing decisional authority was decided prior to the adoption of the Evidence Code is irrelevant. There is no indication the Legislature intended to abrogate the foregoing decisional authority when the Evidence Code was adopted in 1965 and made effective January 1, 1967. (Evid. Code, § 12, subd. (a); see 1 Witkin, Cal. Evidence,
 
 supra,
 
 at p. 13; 7 Cal. Law Revision Com. Rep. (Aug. 1965) p. 1234; McDonough,
 
 The California Evidence Code: A Précis
 
 (1966) 18 Hastings L.J. 89, 114.)
 

 In this case, the decedent, who had a portion of her brain severely injured by the gunshot wound inflicted by defendant, was coherent and alert. She repeatedly told her family members that defendant and his mother’s boyfriend, Mr. Davis, had kicked, beat, robbed, and shot her. She was adamant
 
 *1026
 
 that they be apprehended. There was a sense of urgency to her pleas that family members do something to insure defendant and Mr. Davis were caught. We agree with the Attorney General that the word “robbed” as used by the decedent during the last days of her life was part of a comprehensive description of what caused her injuries and ultimate death. As a result, it was admissible within the dying declaration exception to the hearsay rule.
 
 (People
 
 v.
 
 Cipolla, supra,
 
 155 Cal. at p. 228; Evid. Code § 1242.) No abuse of discretion occurred.
 

 V. Unpublished Issues
 
 *
 

 VI. Disposition
 

 The judgment is affirmed except that the cause is remanded to allow the trial judge to impose or strike the prior prison term pursuant to Penal Code section 1170.1, subdivision (h), and to impose but then stay the sentence on count IV.
 

 Grignon, J., and Jackson, J.,
 
 †
 
 concurred.
 

 [1]
 

 All further statutory references are to the Penal Code unless otherwise indicated.
 

 [2]
 

 Two days following her second surgery, the decedent went into cardiac arrest and slipped into a coma. However, she was able to speak with her mother earlier that day. She was oriented as to: who she was; where she was; the date and time; and what her situation was. The decedent told her mother she was dying and repeated, “They shot me, they kicked me, they beat me, they robbed me.” She told her mother defendant and Mr. Davis did these things to her.
 

 *
 

 See footnote,
 
 ante,
 
 page 1020.
 

 †
 

 Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.